A03A0828. COOK et al. v. MICRO CRAFT, INC.
A03A0829. FAIRCLOTH v. MICRO CRAFT, INC.
(585 SE2d 628)

ELLINGTON, Judge.

This premises liability case arises from the brutal murder of Anna Marie Cook Jackson (hereinafter, the decedent) by her estranged husband, Willie Charles Jackson. The attack which killed the decedent also resulted in the serious injury of her aunt, Mary Faircloth. Gloria Cook, on behalf of the decedent's estate, and Faircloth sued the decedent's employer, Micro Craft, Inc., alleging that

Faircloth and the decedent would not have been injured absent the company's negligence. Both Cook and Faircloth appeal from the trial court's grant of summary judgment to the company. Finding no error, we affirm.

Summary judgment is proper when there is no genuine issue of material fact as to any essential element of a claim, since all other contested issues are rendered immaterial and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c); *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991); *Britt v. Kelly & Picerne, Inc.*, 258 Ga. App. 843 (575 SE2d 732) (2002). We apply a de novo standard of review to an appeal from a grant of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (486 SE2d 684) (1997).

Viewed in this light, the evidence showed that, in April 1997, Jackson was arrested for sexually assaulting the decedent. After Jackson was released from jail, the decedent obtained a restraining order against him because she was "terrified" that he might kill her. The decedent moved in with her aunt, Mary Faircloth, so Jackson would not know where she lived. Faircloth knew that Jackson had seriously abused the decedent in the past and had recently sent threatening letters to the decedent, including one that had the following warning on the envelope: "You can run but you cannot hide."

In early May 1997, the decedent told her supervisor at Micro Craft that "her husband was getting out of jail and that she was afraid he was going to find out where she worked and come after her."[1] Even though it appeared that Jackson did not know where the decedent worked, the decedent asked the supervisor to make sure the doors to the plant were locked, because if Jackson could get into the plant, "we would all be in trouble."

Approximately two weeks later, on May 29, 1997, Jackson called the decedent at home and told her he was "coming to kill her." At about 1:00 p.m., the decedent called Faircloth, told her about the threat, and asked her to come home. The decedent also called the sheriff's office, and a deputy went out to the decedent's home. The deputy told her that there was nothing he could do and referred the decedent to the county social services office.

---

[1] This statement was from an investigation report attached to the affidavit of a Georgia Bureau of Investigation agent. The agent authored the report, and it was not signed by the supervisor who is quoted in the report. In his deposition, the supervisor specifically denied that the decedent had discussed her marital problems with him. Although Micro Craft objected to the report as hearsay, the trial court considered it when deciding whether to grant summary judgment to Micro Craft. The issue of its admissibility at trial is not before us in this appeal.

Faircloth went home, picked up the decedent and a family friend, Shannon Bryant, and drove them to the Micro Craft plant. The decedent wanted to go to the plant, even though her shift did not start until 3:00 p.m. Faircloth decided to drive her Blazer to the plant because she believed Jackson would not recognize it. Faircloth thought the decedent would be safer at the plant than at home, and that they could get inside the plant in case Jackson showed up. Once at the plant, Faircloth intended to go get help from the police. Faircloth also thought they could get to the plant before Jackson would have time to drive from his home in Bainbridge to the plant in Quitman. Faircloth was very afraid of Jackson and was concerned that he might find them on their way to the plant. Neither Faircloth, Bryant, nor the decedent called the company to tell them that Jackson had just threatened to kill the decedent or that they were on their way to the plant. Faircloth admitted that she could have asked the police to escort them to the plant, but she "wasn't thinking."

When Faircloth turned her truck onto the access road to the plant, Jackson was waiting for them on the side of the road. Faircloth did not recognize Jackson or his car, but the decedent became hysterical and screamed when she saw Jackson. Faircloth accelerated and drove onto the plant's parking lot. She pulled up beside a woman standing in the lot and told her to call the police because "[t]here's a man chasing us." Faircloth drove up to the building and stopped three to five feet in front of an open bay door. She did not drive into the building because there were machines, boxes, and three or four men in the doorway. The decedent yelled at an employee to call the police because her husband was following her and trying to kill her. Although they were parked only a few feet from the open bay door, no one in the Blazer tried to get out of the car and run into the building.

Sometime within the next two minutes, Jackson drove up and repeatedly rammed his car into the front passenger side of Faircloth's four-door Blazer, shattering the window. Hearing the commotion, a plant manager immediately activated the silent alarm system, which notified the police, fire department, and ambulance services. Another employee in the front office also called the police.

Jackson got out of his car, reached into the Blazer's window, and tried to grab the decedent, but she climbed into the back seat, temporarily out of reach. Jackson went to the driver's side, opened the driver's door, and ordered Faircloth to get out of the car, but she refused and argued with him. Shannon Bryant's brother, a plant employee, heard the commotion and thought that someone had had a car wreck in the parking lot. While Jackson was standing by Faircloth's door, Bryant's brother approached him. Jackson started slashing his knife toward the man, saying, "M—— f——, if you don't get away from me, I'll kill you too."

After Jackson threatened Bryant's brother, a manager ordered the plant to close the large bay door, a process that takes several seconds. The plant kept a standard "pedestrian" door a few feet away from the bay unlocked, and employees went in and out of the door during the incident.

When Jackson finished arguing with Faircloth, he got back into his car and rammed the Blazer with his car two more times. While he was backing up a third time, Faircloth and Bryant jumped out of the Blazer and ran to the side of the building. Jackson accelerated toward the two, and Faircloth pushed Bryant out of the path of Jackson's car. Jackson ran into Faircloth, pinning her against a guardrail and severely injuring her. Jackson's car stalled, and he was unable to restart it. The car was wedged against the building and guardrail, so Jackson climbed through a window and got out of his car.

Jackson went back to the Blazer, where the decedent was still in the back seat. Both Faircloth and Bryant opined that the decedent had not attempted to run because she was "petrified" and "just froze." Jackson pulled the decedent out of the car and repeatedly stabbed her with a knife. While Jackson was attacking the decedent, a few employees tried to assist the woman, but Jackson threatened them by making stabbing motions toward them with the knife and telling them he would kill anyone who tried to rescue her. During the several minutes before police officers arrived, Jackson stood over the decedent's body and refused to allow anyone to assist her. The decedent died from her wounds.

In their complaints, Cook and Faircloth alleged that Micro Craft breached its duty to exercise care in keeping its premises safe and that the company's negligence caused or contributed to the injuries inflicted by Jackson. Following a hearing on Micro Craft's motion for summary judgment, the trial court granted the motion. Cook and Faircloth appeal the ruling.

1. The appellants contend that the trial court erred in granting summary judgment to the company, arguing that jury issues existed as to whether company officials should have foreseen that Jackson would attack the decedent at the plant based upon the company's alleged superior knowledge of that possibility. For the following reasons, we disagree.

Under OCGA § 51-3-1, an owner or occupier of land has the duty to exercise ordinary care to keep its premises safe. Despite this duty, a property owner is not an insurer of an invitee's safety, and an intervening criminal act by a third party generally insulates a proprietor from liability unless such criminal act was reasonably foreseeable. *Days Inns of America v. Matt*, 265 Ga. 235, 236 (454 SE2d 507) (1995) ("Simply put, without foreseeability that a criminal act will occur, no duty on the part of the proprietor to exercise ordinary care to prevent

that act arises."); *Griffin v. AAA Auto Club South*, 221 Ga. App. 1, 2 (1) (470 SE2d 474) (1996); *Clark v. Carla Gay Dress Co.*, 178 Ga. App. 157, 161 (342 SE2d 468) (1986) (finding an attack by the appellant's husband was not foreseeable by the company as a matter of law, even though the woman had told a supervisor her husband had previously abused her); cf. *Wade v. Findlay Mgmt.*, 253 Ga. App. 688 (560 SE2d 283) (2002) (a jury question existed as to whether a criminal attack was foreseeable, when there was evidence that a similar attack had occurred on the property two months before). Even if an intervening criminal act may have been reasonably foreseeable, however, "the true ground of liability is the *superior knowledge* of the proprietor of the existence of a condition that may subject the invitee to an unreasonable risk of harm." (Citations and punctuation omitted; emphasis supplied.) *Griffin v. AAA Auto Club*, 221 Ga. App. at 2 (1); see also *Britt v. Kelly & Picerne*, 258 Ga. App. at 845 (breach of a property owner's duty, alone, does not make a defendant liable in negligence absent the owner's superior knowledge of an unreasonable risk of harm to invitees). Further, a property owner or occupier

> is not liable for a plaintiff's injuries caused by a dangerous condition if the plaintiff had equal or superior knowledge of the danger and failed to exercise ordinary care to avoid the danger. Although the issue of a plaintiff's exercise of due diligence for his own safety is ordinarily a question for the jury, it may be summarily adjudicated where the plaintiff's knowledge of the risk is clear and palpable.

(Citation, punctuation and footnote omitted.) *Britt v. Kelly & Picerne*, 258 Ga. App. at 845.

In *Griffin v. AAA Auto Club*, a woman sued her employer for failure to provide adequate security after she notified them that her boyfriend had threatened to buy a gun and shoot her at work. 221 Ga. App. at 2 (1). Two days after she notified her employer, she was walking alone to her car in the employer's parking lot after 11:00 p.m. when her boyfriend approached and repeatedly shot her. Id. This Court held that the woman had superior knowledge regarding their relationship and the man's temperament and, therefore, had a far greater basis than her employer upon which to foresee the possibility of an attack at work. Id.; see also *Johnson v. Holiday Food Stores*, 238 Ga. App. 822, 824 (1) (520 SE2d 502) (1999) (plaintiff had knowledge superior to that of her employer regarding an impending attack by her fiancé, because she knew his personality and temperament, as well as the extent that they had argued that day). In affirming the

grant of summary judgment in *Griffin v. AAA Auto Club*, this Court distinguished this type of case

> from those in which a jury could find a legal failure to keep the premises and approaches safe, so that its invitees in general are not subjected to the risk of foreseeable attacks by unknown assailants. This was not a random stranger attack but rather grew out of a specific private relationship which had no connection with employment whatsoever. The place chosen by the boyfriend for the attack just happened to be the employer's parking lot. The employer did not create or allow to exist an environment which placed Griffin at risk any more than if she had been at home or on the street.

221 Ga. App. at 2 (1).

On the issue, then, of whether Micro Craft should have foreseen Jackson's attack in the instant case and whether the decedent and Faircloth had equal or superior knowledge of the possibility of the attack, the undisputed evidence showed that Faircloth and the decedent knew of Jackson's violent history and were terrified of him. Even so, the decedent had several long phone conversations with Jackson in the days before the attack, and, for reasons known only to her, she told Jackson where she lived and worked. More importantly, both women knew that Jackson had specifically told the decedent he was coming over to kill her *that day*. The women knew the decedent was not safe at home and decided to drive to Micro Craft, even though it was possible Jackson would drive to the plant. Further, as a Micro Craft employee, the decedent knew or should have known of the company's security protocol, or lack thereof, and made a conscious decision to go to the plant instead of to a police station or sheriff's office.

In contrast, Micro Craft clearly lacked superior knowledge of Jackson's impending attack. No one called Micro Craft about Jackson's threat on the day of the attack, nor did they notify the company that they were on their way to the plant, fleeing a potential killer. There is no evidence that Micro Craft was aware that Jackson even knew where the decedent worked. As the appellants recognize, the company knew or should have known, at most, that the decedent had previously mentioned to a supervisor that Jackson had "a history of violence," and that the decedent "and anyone else at the plant" would be in danger *if Jackson ever found out where she worked.* There was no evidence that anyone at the plant knew Jackson's name, what he

looked like, or what kind of car he drove.[2] In fact, the record is clear that the very first notice to the company that anything was wrong on the day of the attack was when the women drove onto the property, with Jackson following in hot pursuit. As soon as the employees were aware that there was a problem, they took immediate action.[3] See *Cooper v. Baldwin County School Dist.*, 193 Ga. App. 13, 15 (2) (386 SE2d 896) (1989) (there was no evidence that the school became aware of a fight between students in sufficient time to prevent additional injury to the appellant or that it otherwise delayed its response); cf. *Wade v. Findlay Mgmt.*, 253 Ga. App. at 689-690 (jury question existed as to whether proprietor exercised ordinary care when an employee stood by while a third party attacked a customer and did not attempt to stop the attack or protect the plaintiff). Finally, the company had not experienced any other similar criminal acts that would have created a jury issue as to foreseeability. *Adler's Package Shop v. Parker*, 190 Ga. App. 68, 71 (1) (b) (378 SE2d 323) (1989); cf. *Wade v. Findlay Mgmt.*, 253 Ga. App. at 690-691.

Having reviewed the entire record de novo, we find the clear and undisputed evidence demonstrates that the decedent and Faircloth had knowledge about the impending attack that was equal or superior to Micro Craft. Further, there was no evidence to demonstrate that Micro Craft should have foreseen Jackson's attack. Accordingly, there is no jury issue as to these essential aspects of the appellants' claims. The trial court did not err in granting summary judgment to Micro Craft. *Griffin v. AAA Auto Club*, 221 Ga. App. at 2 (1).

2. Pursuant to our determination in Division 1, supra, that Micro Craft was entitled to summary judgment, appellants' remaining contentions are moot.

*Judgment affirmed. Blackburn, P. J., and Phipps, J., concur fully and specially.*

---

[2] We note that Jackson was driving his mother's car, so it is pure speculation as to whether he would have been recognized even if the company knew to look for him. Although Jackson claimed in a deposition that he had driven around the company parking lot earlier on the day of the attack, there was no evidence that he did anything unusual that should have raised the suspicions of the company. As for the appellants' suggestion that Micro Craft was negligent in allowing the husband on the premises in the first place, there is no general duty to keep spouses off business premises, especially when Micro Craft did not have notice of Jackson's threats on the occasion in question. *Clark v. Carla Gay Dress Co.*, 178 Ga. App. at 162.

[3] Contrary to the appellants' unsupported contentions, there is no evidence that the plant delayed calling police or that plant employees refused to try to aid Faircloth or the decedent during the attack. The undisputed evidence showed that Micro Craft employees immediately called the police, activated the silent alarm, and attempted to intervene until Jackson threatened to kill them.

BLACKBURN, Presiding Judge, concurring specially.

While I concur fully in the opinion of the majority, I write separately to express both my dismay at the total failure of the police to take action and the apparent lack of training as to their responsibilities in such cases.

The underlying facts of this case are appalling. In April 1997, Anna Marie Cook Jackson's husband, Willie Charles Jackson, was arrested and sent to jail for sexually assaulting and physically harming his wife. When Willie was released from jail, Anna was so afraid of him that she had a restraining order issued against him and she moved in with her aunt for additional protection. In violation of the restraining order, Willie began sending Anna threatening letters, stating: "You can run but you cannot hide." On the day of the murder, also in violation of the restraining order, Willie called Anna sometime before 1:00 p.m. and told her that he was "coming to kill her."

After Willie's ominous phone call, Anna called the Brooks County police, and a deputy was dispatched to the home where Anna was staying. Anna explained the situation to the deputy, but, despite the fact that Willie had violated the restraining order and threatened murder, the deputy told Anna that, since no physical contact had already occurred, there was nothing that he could do. Instead of taking any action regarding Willie's clear violations of the restraining order or advising Anna that she could initiate action, the deputy simply told Anna that she should report the matter to a social services worker. Willie brutally stabbed Anna to death later that day.

This complete lack of protective action in the face of a murder threat by a known aggressor in violation of a restraining order is simply abominable. The deputy's statement to Anna that there was nothing that the police could do to help her is patently untrue. At the very least, the officer could have taken Anna back to the police station until her husband had been located. Moreover, the officer should have immediately taken action on Willie's violations of his restraining order, setting in motion his arrest for this crime. Had these acts been taken, the needless murder which occurred might have been prevented. The State's inaction indicates a complete abdication of responsibility by the officer or inadequate training of such officer.

In this case, Anna Jackson had clearly taken steps to invoke the protection of the State and its police force by seeking a restraining order against Willie. Yet, despite Anna's invocation of such protection, the police failed to hear her cry for help and told her that there was nothing that could be done for her. This should not have happened, and the police should ensure that officers receive proper training and education in these matters. Justice is blind. It should not be

deaf to the pleas of victims as well because of poor police performance.

I am authorized to state that Judge Phipps joins in this special concurrence.

DECIDED JUNE 19, 2003 —
RECONSIDERATION DENIED JULY 17, 2003 — 

*Warshauer, Woodruff & Thomas, Michael J. Warshauer, Bradford W. Thomas, Jay, Sherrell, Smith & Braddy, Robert E. Sherrell,* for appellants.

*Elliott & Blackburn, James L. Elliott, Young, Thagard, Hoffman, Smith & Lawrence, Daniel C. Hoffman,* for appellee.